MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2015 ME 77
Docket:      Sag-14-393
Argued:      May 13, 2015
Decided:     June 18, 2015

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## STATE OF MAINE

v.

## JOSHUA M. ROBINSON SR.

ALEXANDER, J.

[¶1]  Joshua M. Robinson Sr. appeals from a judgment of conviction of burglary (Class C), 17-A M.R.S. § 401(1)(A) (2014), and theft by unauthorized taking or transfer (Class E), 17-A M.R.S. § 353(1)(A) (2014), entered by the Superior Court (Sagadahoc County, *Horton, J.*) following a jury trial.  Robinson contends that the trial court abused its discretion by allowing a witness to testify regarding the witness's previous identification of Robinson in a now-unavailable surveillance video recording.  We affirm the judgment.

### I.  CASE HISTORY

[¶2]  The following facts, viewed in the light most favorable to the jury's verdict, as required by our standard of review, are derived from the trial record.  *See State v. Ormsby*, 2013 ME 88, ¶ 2, 81 A.3d 336.

[¶3]   On August 26, 2013, at 1:20 a.m., an officer of the Bath Police Department was patrolling Water Street and Centre Street in Bath, "checking the backs of buildings" for security purposes.  He observed Robinson at the back of one building, walking behind a large, parked box truck.  Finding it unusual to see someone in that area at that time of night, the officer left his vehicle and met Robinson as he came around the back of the truck toward the officer.  The officer noticed that Robinson had a "heavy odor of alcohol on his breath, his eyes were a little bit bloodshot, and once in a while he slurred words."  Robinson later maintained that he had been urinating by the back of the truck.  The officer did not see anyone other than Robinson in the area.

[¶4]  The officer noticed a "strange pile of items" sitting on the ground next to the truck.  The pile included "four bottles of alcohol, roughly liter size," three of which were full and appeared unopened; "four boxes of wax food wrapping paper"; "a butcher knife with a red handle on it"; and "a Makita drill and . . . charger unit."  On top of the pile was a cell phone, later determined to belong to Robinson.

[¶5]  Two other officers arrived to check nearby businesses for signs of forced entry.  The officers located an open window, with the screen removed, at Beale Street Barbeque.  The restaurant's owner ("the owner") arrived in response to a call about the incident.  The officers showed the owner the pile of items, and

he identified the items as taken, without permission, from Beale Street Barbeque. On the night of the burglary, the officers did not ask the owner whether the restaurant had a surveillance system, and the owner never informed the officers about any surveillance system.

[¶6] While some officers were talking with the owner, another officer had placed Robinson in the back of a police cruiser. The owner stood approximately fifteen to twenty feet away from Robinson, and he recognized Robinson, who had worked as a cook at the restaurant from April 2005 to February 2007. During those years, the owner had seen Robinson "a minimum of" twenty to thirty times and had some "memorable occasions" with him.

[¶7] At the police station, Robinson stated that he had "no idea" how his cell phone ended up on the pile, and that "[h]e must have just sat there while he was waiting for his cousin." He did not know where his cousin was but said that they had been together at another bar when Robinson left that bar to urinate. When asked if his fingerprints would be found on the stolen property, Robinson stated, "I don't know, maybe."

[¶8] Robinson was charged by indictment with one count of burglary (Class C), 17-A M.R.S. § 401(1)(A), and one count of theft by unauthorized taking or transfer (Class E), 17-A M.R.S. § 353(1)(A). Robinson pleaded not guilty, and the case was set for trial.

4

[¶9]  On July 14, 2014, after the jury had been selected, the restaurant owner advised the State that there had been a surveillance video recording of the burglary. The owner also stated that four or five days after the burglary, he had reviewed the video and identified Robinson, though he had not seen Robinson's face.  The video had been automatically recorded over approximately a month after it was initially recorded, as a normal function of the surveillance system.  The State immediately notified Robinson and advised him that, because the original video was unavailable, the State would propose to have the owner testify as to his observations of the video as evidence that Robinson had been inside the restaurant.

[¶10]  The jury trial was held between July 23 and 25, 2014.  Before the start of the trial, Robinson made a motion in limine to exclude any identification testimony by the restaurant owner and any other evidence concerning the video. Robinson argued that (1) there was insufficient foundation for the owner to provide lay opinion testimony pursuant to M.R. Evid. 701; and (2) because the cameras were not intended for use at night, and the owner had watched the video approximately one year prior to trial while believing that Robinson had confessed to committing the crimes, the testimony was not relevant and was unfairly prejudicial pursuant to M.R. Evid. 401 and 403.[1]

---

[1]  Because Robinson has not raised the relevance argument on appeal, *see* M.R. Evid. 401, we do not address it here.

[¶11] During a voir dire examination out of the presence of the jury, the owner explained that the surveillance video system at the restaurant ran on a continuous loop hard drive, such that it recorded over itself regularly. The surveillance system records most of the dining room, the bar in the dining room, and the production line in the kitchen. The owner had viewed the video "a few days" after the incident, to see if the restaurant employee in charge of closing had locked the window. The owner viewed the video for internal reasons and did not watch it for the purpose of identifying the intruder.

[¶12] The owner testified that, on the video of the night of the burglary, he saw a person come through the door, and he recognized the person as Robinson based on the intruder's height, size, hair color, and "the way he was moving and interacting." The owner explained, "I recognized him by his body type. You know, I can't clearly say that I didn't see his face." He described the man in the video as "big" and "bulky," like Robinson, who was called "Tank" at the restaurant. The owner said that upon watching the video, he "fully believed" and was "personally certain" that the person he saw was Robinson.

[¶13] The owner also acknowledged that the images in the video were not "well-illuminated" at the time of the incident, and that it was difficult to make out facial features in the video because it was "low resolution and dark." There was some ambient light coming in from outside, a computer lighting the bar area, and a

6

light in the hallway, which remained on such that it was clear when the door in the front of the restaurant opened and closed at night. The owner said that his mind would not be changed if he knew that someone of approximately the same size and hair color had confessed to the burglary, because he "fully believe[d] . . . Robinson was in there," and he "believe[d] in [his] ability to have recognized that." When asked why he did not inform the police of the existence of the surveillance video, the owner responded, "I really didn't consider it that important. It didn't occur to me. I thought it was kind of a slam dunk case."

[¶14] The court ruled that the owner would be permitted to testify as to his observations from the video pursuant to M.R. Evid. 1004,[2] rejecting Robinson's argument that the testimony should be excluded by Rules 401 and 403. Robinson requested that the court make findings regarding the ability of a lay witness to provide identification testimony pursuant to M.R. Evid. 701, to which the court responded by finding that

> [the owner] was able to perceive this video, and . . . his observations
> of what was on the video are rationally based and they are relevant to
> a determination of the facts in issue. So if [the owner] were
> speculating or guessing and that he may be asked all of these

---

[2] In support of admission of the owner's testimony pursuant to M.R. Evid. 1004, the court found the following facts, supported by competent evidence in the record: (1) the video recording system was functioning on August 26, 2013, in the early morning hours at the time of the incident; (2) the video was recorded over some time no later than the end of September or October, before Robinson was indicted; and (3) "the originals have been lost, and not lost as a result of any action by the State or any act of bad faith on the State."

questions again, I will instruct him not to guess or speculate, but to answer based on the best of his recollection.

[¶15]  The owner then testified to the jury, reporting observations similar to, though in less detail than, those provided during the examination out of the presence of the jury.  He testified that in the video, he saw the person "emerge from the kitchen in [the] archway, and . . . saw that person proceed to the bar, go back to the archway, come back out again, pop upstairs, [and then] come [downstairs] and exit."  He testified that he "recognized [Robinson] by the features that [he] could see on the video," and that he recalled the person in the video as being of a body type and height similar to the owner himself, with "his hair being dark, and his movements and his person to be what [he] recognized as [Robinson]."

[¶16]  Three witnesses called by Robinson testified that Robinson's cousin, who was with him the night of the incident, had stated to each of them that he was the one who entered the restaurant on August 26, 2013.[3]  Those witnesses reported that Robinson's cousin stated that he and Robinson had been out drinking, they were "very drunk," and the cousin wished to continue drinking.  He had no money, so he broke into Beale Street Barbeque alone, while Robinson was "passed out"

---

[3]  The cousin asserted his Fifth Amendment privilege, and thus was declared an unavailable witness for the purposes of M.R. Evid. 804(b)(3) (providing that statements by an unavailable witness against his or her own interest are admissible as an exception to the hearsay rule).

8

nearby, and he took the bottles of alcohol and other items. The witnesses reported that the cousin had stated that he left Robinson, still passed out, to retrieve a bag so that he could take the items and Robinson home. The witnesses testified that Robinson and his cousin were, at the time of trial, approximately the same size, but that Robinson used to be "very heavy" and weighed more in the past.

[¶17] After the defense rested, the State presented a Bath Police detective as a rebuttal witness. He testified that the cousin gave him a similar, though more vague, account of the events on the night of the incident. Robinson did not testify.

[¶18] After closing arguments, the court instructed the jury regarding the elements of burglary and theft, and, additionally, on accomplice liability[4] and the inference of exclusive possession—that is, if the State proves beyond a reasonable doubt that a defendant is in exclusive possession of property recently stolen in a burglary or theft, the law allows the permissive inference that the defendant participated in the burglary and theft. *See* 17-A M.R.S. § 361-A(1) (2014); M.R. Evid. 303(b); *State v. Austin*, 518 A.2d 1042, 1044-45 (Me. 1986); *State v. Durgan*, 467 A.2d 165, 167-168 (Me. 1983).

---

[4] The accomplice liability instruction was generated by the defense testimony suggesting that Robinson's cousin may have been the individual who entered the restaurant, combined with the police testimony that, at around the time of the burglary, Robinson was in the vicinity of the building, and the stolen goods and Robinson's cell phone were found near Robinson. *See State v. Cook*, 2010 ME 85, ¶ 12, 2 A.3d 333 (stating that once presence at the scene of a crime is proved, accomplice liability may attach upon proof of any conduct, however slight, promoting or facilitating the commission of the crime).

[¶19]  The jury returned guilty verdicts on the burglary and theft charges. Following a sentencing hearing, Robinson was sentenced to two years and six months' confinement on the burglary charge and a concurrent six-month sentence on the theft charge, with all but eighteen months suspended, followed by two years of probation.   The court also required Robinson to pay $597 in restitution. Robinson brought this timely appeal pursuant to 15 M.R.S. § 2115 (2014) and M.R. App. P. 2.

## II.  LEGAL ANALYSIS

[¶20]  Robinson argues that the court abused its discretion by allowing the restaurant owner to testify identifying Robinson as the person observed in the surveillance video, because the video was of such poor quality that the identification was not "rationally based on the perception of the witness" as required by M.R. Evid. 701.  Robinson also argues that because the owner knew at the time he viewed the video that Robinson had been arrested and believed that Robinson had confessed to the crimes, his identification testimony is speculative and unreliable.

[¶21]  We review a trial court's admission of lay witness testimony pursuant to M.R. Evid. 701 for an abuse of discretion.  *State v. Patton*, 2012 ME 101, ¶ 20, 50 A.3d 544.  We also review the admission of evidence over an objection of unfair prejudice pursuant to M.R. Evid. 403 for an abuse of discretion.  *See*

*id.* ¶ 24. Factual findings regarding the foundation for admitting evidence are reviewed for clear error. *See State v. Gurney*, 2012 ME 14, ¶ 36, 36 A.3d 893. "A trial court commits clear error on evidence questions when its findings regarding the foundation for admitting or excluding evidence are not supported by facts in the record." *Id.*

A.    The Best Evidence Rule: Other Evidence of Contents

[¶22]  Pursuant to the best evidence rule, when evidence is presented in the form of a writing, recording, or photograph, the original must be used to prove its content unless an exception applies. *See* M.R. Evid. 1002.  Alternative evidence of the content of a writing or recording is admissible if "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."[5] M.R. Evid. 1004(1); *see also* Field & Murray, *Maine Evidence* § 1004.1 at 567 (6th ed. 2007).

[¶23]  "Once the requirements of M.R. Evid. 1004 [are] met, any type of secondary evidence, not otherwise inadmissible, becomes admissible."  *State v. Williams*, 395 A.2d 1158, 1165 (Me. 1978).  "That this evidence may not be credible does not affect its admissibility, but only its weight.  The weight is a matter for the trier of fact to resolve."  *Id.*; *see also* Field & Murray, *Maine*

---

[5]  M.R. Evid. 1004 has since been replaced, effective January 1, 2015, with restyled language that does not affect the substance of the rule.  *See* M.R. Evid. 1004 (restyled Maine Rules of Evidence).

*Evidence* § 1004.2 at 569 ("If the judge admits the secondary evidence [of original evidence that has been lost or destroyed], testimony as to suspicious circumstances may be presented to the jury as bearing on its weight."). Here, the court's foundational findings that the surveillance video recording was recorded over automatically, and not as a result of any act of bad faith by the State, were supported by competent evidence in the record. Accordingly, the restaurant owner's testimony regarding his observations of the video was not precluded by the best evidence rule.

B.    Opinion Testimony by a Lay Witness

[¶24]   In his objection to the owner's testimony, Robinson relies on M.R. Evid. 701, which states:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.[6]

Determining admissibility pursuant to Rule 701 is "within the discretion of the trial [court,] . . . [which] has the opportunity to observe the witness." *Pierce v. State*, 463 A.2d 756, 760 (Me. 1983).

---

[6]   M.R. Evid. 701 has since been replaced, effective January 1, 2015, with restyled language that does not affect the substance of the rule. *See* M.R. Evid. 701 (restyled Maine Rules of Evidence).

12

[¶25]   When both the jury and a witness can view the same photograph or video, the witness's identification of the people in the photograph involves "a kind of lay opinion."  Field & Murray, *Maine Evidence* § 701.1 at 369.  That is because the "eyes [of the jurors] are as good as those of a lay witness."  *Id*.  When the witness's testimony is a statement as to what that witness saw, heard, tasted, smelled, or otherwise perceived with his or her senses, it is not necessarily lay opinion testimony, admissible only after Rule 701 analysis.  Testimony about what a witness has directly observed using his or her senses is properly considered by the fact-finder to determine the accuracy of the witness's observations, rather than the veracity of the witness's opinions.   A witness's testimony reporting the witness's observations may become lay opinion testimony only when the witness is asked to draw conclusions from the reported observations about matters that are not readily apparent from the reported observations.

[¶26]   Here, the owner's report that he saw in the video a heavy set man moving around the restaurant was an observation properly admitted and reviewable for accuracy by the fact-finder.  Although the jurors were unable to see the video with their own eyes, the owner's conclusion, based upon his own prior observations of Robinson, that it was Robinson in the video may only be admitted as lay opinion testimony.

[¶27]   A lay opinion "does not meet the standard of Rule 701 if it is not rationally based wholly and solely on the perceptions the witness acquired through his personal observations." *Mitchell v. Kieliszek*, 2006 ME 70, ¶ 13, 900 A.2d 719. "[S]uch perception must be adequately grounded on personal knowledge or observation just as would be the case with simple statements of fact." *Id.*

[¶28]   In *State v. Miller*, 1999 ME 182, ¶¶ 5, 11, 741 A.2d 448, we affirmed the admission of the testimony of two detectives regarding their opinions that the defendant was the person depicted in surveillance photographs.  We stated that the requirements of Rule 701 were met in that context when "'the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification.'"   *Id.* ¶ 9 (quoting *United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995)).  Additionally, we stated:

> Of paramount importance in determining whether the witness's opinion will be helpful to the factfinder is the witness's opportunity to observe the defendant in different settings, in different lighting, and under different circumstances than the jury, in such a way that the witness's scrutiny of the photograph at issue and comparison to the witness's knowledge of the defendant's appearance will bring more to the jury's assessment of the facts than they could glean from observation of the defendant in the courtroom.  Such testimony will be more helpful to the jury when the witness has had substantial and sustained contact with the person in the photograph . . . .

14

*Miller*, 1999 ME 182, ¶ 10, 741 A.2d 448.

[¶29]  In *Miller*, we analyzed the admissibility of identification testimony when the original photograph was available, and thus, the relevant question was whether the jury itself was in as good a position as the testifying witness to look at the photograph and identify the defendant.  *See id.* ¶¶ 3, 5-6, 9-10.  The question of what is required for identification testimony reporting observations of a photo or video that has been lost or destroyed is an issue of first impression in Maine.  However, we can find guidance on this question from federal precedent interpreting a similarly worded Rule 701 in the Federal Rules of Evidence.  *See id.* ¶ 7 & n.6; *Cameron v. City of New York*, 598 F.3d 50, 67 (2d Cir. 2010) (stating that a witness could testify on retrial as to the content of a 9-1-1 call recording and arrest photograph no longer in existence when the witness personally observed them, but that she could not testify as to her legal conclusions about the case); *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984) (stating that identification testimony by a lay witness is admissible "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury").

[¶30]  Here, the owner provided opinion or inference testimony identifying Robinson as the person in the surveillance video in a manner that was both (a) based upon his own personal observation of the video and (b) helpful to the

jury's understanding of a crucial fact in issue—the identity of the person inside the restaurant—that the jurors could not have replicated by examining the video themselves.

[¶31] Rule 701(a) requires only that the witness's testimony be adequately grounded in his own firsthand knowledge, which in this case was established by the facts that the owner knew Robinson, viewed the video, and formed an opinion regarding the burglar's identity based upon his familiarity with Robinson and his observations from the video. *See Mitchell*, 2006 ME 70, ¶ 13, 900 A.2d 719; *State v. Johnson*, 434 A.2d 532, 534-35 (Me. 1981) (upholding the admission of a medical examiner's testimony about the appearance of ceramic or pottery fragments as "rationally based on his own observations" and not purporting to be expert testimony); Field & Murray, *Maine Evidence* § 701.1 at 365-66 (describing the "rationally based" language as meaning only that the opinion be one that a normal person, without specialized knowledge, would form from the observed facts).

[¶32] With regard to Rule 701(b), the owner's voir dire testimony established that he was familiar not only with Robinson's physical attributes, but also with his body movements, as the result of working with him for two years. Even if the video were available at trial, this information placed the owner in a better position than the jurors to make the identification. *See Miller*, 1999 ME 182,

¶¶ 9-10, 741 A.2d 448.  In addition, although there was evidence that the surveillance system was not intended for use at night and that the owner could not make out facial features while viewing the video, the owner explained that there was some light from various sources, and that he was able to view the intruder and conclude that it was Robinson.[7]  Thus, the observed evidence was not so "hopelessly obscure" that the owner could no better identify Robinson in the video than could a jury.[8]  *Id.* ¶ 9.

[¶33]  The trial court's admission of the testimony was an appropriate "short-hand rendering of the facts" from the owner's observation and identification in the destroyed surveillance video evidence, without which the jury would have lacked evidence to counter Robinson's contention that he did not enter the restaurant that evening.  *See State v. Cunningham*, 1997 ME 60, ¶ 4, 691 A.2d 1219 (stating that admission of lay witness testimony may be necessary to develop certain evidence "in order not to risk its loss").

---

[7]  When considering the voir dire testimony of the owner, the trial court also had in evidence a photo of the restaurant downstairs, which it found to be "more or less" what would have been depicted in the video the night of the incident.  The owner did testify, however, that the lighting on the night of the incident was likely "a little dimmer" than was shown in the photo.

[8]  Although Robinson has also suggested that we should apply the same analysis to the owner's testimony that has been applied to out-of-court identifications to exclude identifications made in overly suggestive environments controlled by police, *see generally Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), this line of case law focuses on government misconduct in identification procedures and related due process concerns, *see Perry v. New Hampshire*, 132 S. Ct. 716, 719 (2012) (stating that "[t]he due process check for reliability . . . comes into play only after the defendant establishes improper police conduct").  In this case, there was no government misconduct involved in the owner's identification of Robinson, and Robinson had ample opportunity to cross-examine the owner and impeach his credibility.

[¶34] The majority of Robinson's contentions—that the video was obscured by night; that years had passed between when the owner knew Robinson and when he viewed the video, and another year between his viewing the video and testifying at trial; and that the owner may have been influenced by a misconception that Robinson had already confessed—go to the weight, not the admissibility, of the owner's testimony. Robinson was given ample opportunity to impeach both the owner's credibility and the accuracy of his observations. The court did not abuse its discretion in admitting the owner's testimony about his observations of the video over Robinson's Rule 701 objection. The weight to be given to the owner's testimony was in the province of the jury as fact-finder. *See State v. Watson*, 2000 ME 77, ¶ 8, 751 A.2d 1004.

C.     Prejudice versus Probative Value

[¶35] Evidence that is otherwise admissible may be excluded if its probative value is "substantially outweighed" by dangers including "unfair prejudice, confusion of the issues, or misleading the jury." M.R. Evid. 403. Prejudice, however, "means more than merely testimony that is damaging. A party's case is always damaged by evidence that the facts are contrary to his contentions; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis . . . ." *Miller*, 1999 ME 182, ¶ 12, 741 A.2d 448. "Trial courts are given considerable discretion . . . to determine

whether evidence would be more prejudicial than probative . . . ." *State v. McMahan*, 2000 ME 200, ¶ 17, 761 A.2d 50.

[¶36] The fact that the original surveillance recording was missing, by no fault of the State or the defense, and that there was no other evidence placing Robinson inside the restaurant on the evening in question, was relevant to the trial court's analysis and ultimate determination that the probative value of the owner's observations outweighed any risk of unfair prejudice or of misleading the jury. *See* M.R. Evid. 403. Additionally, the court indicated following voir dire that it would not allow the owner to speculate about the video but would only permit him to testify based on his personal knowledge. This restriction limited any concerns with regard to prejudice. *See Miller,* 1999 ME 182, ¶¶ 14-17, 741 A.2d 448. The owner did not attempt such speculation when he testified in front of the jury, offering only his observations reporting what he saw on the video. The admission of the owner's testimony did not violate Rule 403. Admitting the testimony was not an abuse of discretion, nor was it so unfairly prejudicial as to virtually deprive Robinson of a fair trial.

The entry is:

Judgment affirmed.

**On the briefs:**

Lauren Wille, Esq., DeGrinney Law Offices, Portland, for appellant Joshua M. Robinson Sr.

Katie R. Hollstrom, Asst. Dist. Atty., Sagadahoc County District Attorney's Office, Bath, for appellee State of Maine

**At oral argument:**

Lauren Wille, Esq., for appellant Joshua M. Robinson Sr.

Patricia Mador, Asst. Dist. Atty., Sagadahoc County District Attorney's Office, for appellee State of Maine

Sagadahoc County Superior Court docket number CR-2013-203
For Clerk Reference Only